LEICESTER PIANO CO. v. FRONT ROYAL & RIVERTON IMP. CO.

(Circuit Court of Appeals, Fourth Circuit.    March 11, 1893.)

No. 42.

1. SPECIFIC PERFORMANCE—FALSE REPRESENTATIONS.
 A land company agreed to donate land and money and erect a building for a manufacturing company, in consideration that the latter would move its plant there and operate it on a specified scale. In a suit by the manufacturing company for specific performance, the defense was that the contract was induced by plaintiff's false representations and fraudulent concealment of material facts. A soliciting agent of the land company had visited plaintiff's factory pending negotiations for the contract, and had seen its machinery, but he was not a scientific or practical machinist, and he was not furnished with any means of investigation of plaintiff's financial condition. *Held,* that it could not be said that in executing the contract the land company relied on its own knowledge and judgment. as derived from the investigations of its agent.

2. SAME—CAVEAT EMPTOR.
 In the execution of such contract the maxim caveat emptor has no application, for the land company (defendant) was the vendor, and it had a right to rely on the representations of the general manager of the manufacturing company, who owned most of its stock, and who had reorganized it after it had lain dormant some 10 years or more.

3. SAME—CHANGE OF CIRCUMSTANCES—OPPRESSION.
 Where such contract was consummated during the time of great speculative enterprise and activity, known colloquially as a "boom," in contemplation of the establishment of a successful and paying industry on the land donated by the land company, but after a part performance in good faith by such company a collapse occurred, which renders it extremely improbable that the venture would be successful or benefit either party, while completion of the contract would absorb all the assets of the otherwise solvent land company, the court is authorized to refuse to decree specific performance, on the ground that, in view of the changed circumstances, it would operate unjustly and oppressively on the land company.

4. SAME—MUTUAL PERFORMANCE.
 It was shown that the land company had already donated more money than it was required to do by the contract; that money donated to the plaintiff for the expense of moving its plant had been used by it for other purposes; that plaintiff was operating its factory with borrowed money; and the bill contained no specific allegations that it was in a position to effect the removal of its plant, as required by the contract. *Held,* that specific performance was properly refused on the ground that mutual performance of the contract could not be secured by the decree.

**5. SAME--RESCISSION--CROSS BILL.**

Relief based upon an alleged rescission of the contract by the land company cannot be granted in such suit when it is not prayed for in a cross bill.

**6. SAME--APPEAL--REVIEW.**

On an appeal from a decree granting or refusing the specific performance of a contract, the appellate court has the power not only to decide all questions of law and fact presented by the record, but also to determine whether the court below acted wisely and justly, under the special circumstances of the case, in exercising its extraordinary and discretionary jurisdiction relating to specific performance.

Appeal from the Circuit Court of the United States for the Western District of Virginia.

In Equity. Suit by the Leicester Piano Company against the Front Royal & Riverton Improvement Company for specific performance. There was a decree for defendant, and plaintiff appeals. Affirmed.

The following statement and opinion were filed in the court below by the Honorable JOHN PAUL, District Judge:

On the 18th day of September, 1890, plaintiff and defendant companies entered into this agreement:

"Articles of agreement made and entered into this eighteenth day of September, eighteen hundred and ninety, between the Front Royal and Riverton Improvement Company, a corporation under the laws of Virginia, of the first part, and the Leicester Piano Company, a corporation under the laws of Michigan, by Geo. V. Leicester, president, of the second part, witness: That said improvement company agrees to and with said Geo. V. Leicester, president as aforesaid, that the said improvement company will erect on three acres of its land between Front Royal and Riverton, Va., situate on the Virginia Midland Railroad, suitable buildings for a piano factory, at a cost not exceeding fifteen thousand dollars, ($15,000,) said buildings to be erected under the supervision and direction of said Geo. V. Leicester and C. A. Macatee, who shall have the right to call upon said improvement company for installments of said fifteen thousand dollars as the same may be needed in the erection of said buildings; and the said improvement company further agrees that it will furnish the said Geo. V. Leicester, president as aforesaid, twenty thousand dollars ($20,000) in money to be paid in installments as hereinafter provided,—in consideration of which the said Geo. V. Leicester, president as aforesaid, agrees to transfer to said improvement company seventeen hundred and fifty (1,750) shares of the stock of said piano company of the par value of twenty-five dollars ($25) per share, said stock to be paid-up and nonassessable stock. And said Geo. V. Leicester, president as aforesaid, agrees and covenants that as soon as said buildings are ready for use, that said Leicester Piano Company's plant shall be removed to said building, and that at once the said piano company will commence and continue the active work of manufacturing pianos therein. And it is further agreed by and between the parties hereto, that said improvement company shall be represented in the directory of the said piano company in the same proportion that its stock bears to the entire stock of said company, and shall be entitled to have chosen from its own stockholders at least one of the officers of the piano company. The twenty thousand dollars in money hereinbefore agreed to be furnished in installments, from time to time, as needed by said piano company, and as may be agreed on by the presidents of said companies, respectively, but the whole amount of said twenty thousand dollars shall be paid within one year from the completion of the building, provided that no payment in excess of six thousand dollars ($6,000) shall be called for or made until said plant shall have been removed from its present location to the buildings to be erected, as hereinbefore mentioned. The paid-up, nonassessable stock hereinbefore agreed to be transferred to said improvement company to be preferred stock to the extent of

receiving a maximum annual dividend of six (6) per cent. before any dividend shall be declared on the other stock of said company. The three acres of land hereinbefore mentioned, with the buildings thereon, are to be deeded by the Front Royal and Riverton Improvement Company to the Leicester Piano Company; and the lot herein referred to is bounded by Virginia Midland Railroad and Happy creek on the west, the Buck reservation on the south, and the streets next adjoining thereto ont he north and east. Witness the following signatures and seals:

[Signed by]

"H. H. Downing. [Seal.]
"Leicester Piano Company. [Seal.]
"Geo. V. Leicester, President.

"Witness to signatures: C. B. Samuels."

In pursuance of this agreement, work was commenced on the building in October, 1890, and about $17,000 was expended on it, and it would have required from $1,000 to $2,000 to complete it. About $6,000 of the $20,000 agreed to be paid by the defendant in the suit to the plaintiff had been paid over to Geo. V. Leicester, the president of the said piano company, and 950 shares of the stock of the said company had been transferred by the said Leicester to the Front Royal and Riverton Improvement Company. On the 24th day of June, 1891, the Front Royal and Riverton Improvement Company gave notice to the Leicester Piano Company, declaring the contract of September 18, 1890, canceled and void. The following is the notice:

"To Geo. V. Leicester and the Leicester Piano Company: Take notice that the contract entered into September 18, 1890, between the undersigned, the Front Royal and Riverton Improvement Company, of the one part, and the Leicester Piano Company, by Geo. V. Leicester, president, party of the second part, is hereby declared canceled, and null and void.

"This action is taken upon the following ground: That said the Front Royal and Riverton Improvement Company was induced to enter into and conclude said contract by representations made to it by said Leicester Piano Company through its president, Geo. V. Leicester, which said representations said the Front Royal and Riverton Improvement Company believed to be true, and entered into said contract because it believed them to be true. These representations the Front Royal and Riverton Improvement Company has recently discovered to be false and fraudulent, and, being so false and fraudulent, the consideration and inducement moving said the Front Royal and Riverton Improvement Company to enter into said contract has wholly failed.

"You are further notified that the resolution by the board of directors, appointing Geo. V. Leicester one of its agents to superintend the erection of buildings under said contract, has been rescinded, and such agency annulled.

"You are further notified and required to account to this company for all moneys paid to Geo. V. Leicester or Geo. V. Leicester, president, under said contract, which have not been expended in the legitimate cost of erecting said buildings, and that, if this latter demand is not complied with in a reasonable time, legal proceedings will be instituted against Geo. V. Leicester and against the Leicester Piano Company to enforce the same.

"Witness the following signature and seal, the Front Royal and Riverton Improvement Company causing this notice to be signed by its president, H. H. Downing, and its official seal to be hereunto affixed at Front Royal, this 24th day of June, 1891:

"Front Royal & Riverton Improvement Co.
"H. H. Downing, Prest."

On the services of this notice, work on the building at once ceased, and no further business transactions were had between the said companies under the agreement of September 18, 1890. On the ―――― day of July, 1891, the plaintiff instituted this suit for a specific performance of the contract of September 18, 1890. In its bill it recites the history of its dealings with the defendant; alleges that it has in good faith performed all its obligations under the contract of September 18, 1890; and asserts its readiness, willingness, and ability to perform all of its obligations under said contract, except so far as it is prevented by the acts of the defendant. It prays that the said building may be completed by the defendant with reasonable diligence, according to the

said contract, and that the court will decree the payment by the defendant to the complainant the sum of $14,000, the remaining portion of said $20,000 agreed to be paid under the contract, upon compliance with said contract by the complainant, and that a conveyance be made by the defendant of the said tract of land with the buildings and improvements thereon, according to the terms of the contract.

The defendant files two pleas,—one denying the complainant's citizenship; another alleging a variance between the writ and the bill filed. It also files a general demurrer to the bill. It answers the bill, and alleges as a defense to the specific enforcement of the contract of September 18, 1890, that the said contract was procured and was entered into on the part of said defendant by reason of the false representations of Geo. V. Leicester, who represented himself to be the president of the Leicester Piano Company, then located and doing business in the state of Massachusetts. That said Leicester represented said piano company as owning a valuable plant; that it was doing a good and profitable business, was entirely free of debt, had never lost any money in its business, and had a capital of one hundred and fifty thousand dollars, of which one fifth, or the sum of thirty thousand dollars, had been actually paid into its treasury in money and property; that the defendant had no means of verifying or testing the truth of these statements; that it had to, and did, rely entirely upon the statements of said Leicester. It alleges that all of these statements and representations were untrue, and were known to be untrue by the said Leicester at the time he made them. It also charges the said Leicester with wasteful and reckless extravagance in the construction of the said piano building, with a failure to render proper accounts, and with a diversion of the money paid to him for building purposes to his own uses.

PAUL, District Judge. The two pleas and the demurrer filed in this cause, not having the certificate of counsel and supported by the affidavit of the defendant, as required by rule 31, Rules of Practice in Equity, will be stricken out and not further considered. A great deal of testimony has been taken in this case by both the plaintiff and the defendant, which the court considers irrelevant and immaterial to its proper decision. Of this character, especially, is the great mass of the testimony taken relative to the conduct of Geo. V. Leicester as one of the superintendents of the erection of the buildings, in the purchase of material, controlling the work, failure to keep proper accounts, and make accurate and timely reports of the disposition of the money paid him. The said Leicester and C. A. Macatee were the agents of both the plaintiff and defendant companies for the construction and supervision of the building, and, as such agents, were responsible to their principals for a faithful performance of their duties; but the conduct of both or either of them cannot be made the basis of a refusal by their principals to specifically comply with the contract of September 18, 1890. The court deems it unnecessary to further consider this testimony for a proper decision of this case.

With all this extraneous matter eliminated from the case, the one question presented to the court for its decision is this: Was the contract which it is sought to specifically enforce honest, fair, just, and reasonable? Is it such a contract as the court, in the exercise of a sound legal discretion, can see its way clearly to decree its specific performance? This question must be determined by the evidence bearing on the allegations of the defendant in its answer that it was induced to enter into the contract of September 18, 1890, by the fraudulent and false representations of the plaintiff. It is charged that the plaintiff, through its president, Geo. V. Leicester, by whom it entered into the contract, was represented as "owning a valuable plant; that it was doing a good and profitable business; was entirely free from debt; that it had never lost any money in its business, and had an authorized capital of one hundred and fifty thousand dollars, of which one fifth, or the sum of thirty thousand dollars, had been actually paid into the treasury."

That these representations were made by Leicester, the president of the plaintiff company, to the defendant company is abundantly shown by the testimony of Downey, the president, and Cook, King, and Macatee, directors, of the defendant company. From the testimony of these witnesses it is clear that these representations were the inducing cause to the defendant company for entering into the contract of September 18, 1890, and that but for these

representations, and the belief that they were true, said defendant company would not have made the contract. It is clear from the testimony of these witnesses that the defendant company believed it was contracting with a solid, substantial, well-established industry, free from debt, with a capital of $30,000, which, with the $20,000 to be paid it by the Front Royal and Riverton Improvement Company, would establish the enterprise on a successful basis. That these representations were made by the plaintiff to the defendant is not denied by the only witness introduced by the plaintiff, George V. Leicester, its president, through whom the contract was made, except as to the amount of paid-in capital, $30,000, which he says he meant to include both money and property put into the piano company; but this position cannot be sustained in face of the evidence of the defendant, given by the four witnesses above named, who all testify that Leicester represented the piano company as having a paid-in capital in money of $30,000. Leicester also admits that he knew, at the time of entering into the contract for his company, that it owed $6,000 to Trowbridge and Johnson, but insists that he communicated this fact to the defendant, and that the defendant knew of this indebtedness at the time it made the contract.

Says Mr. Downing: "Mr. Leicester told me that $30,000 in cash had been put into the business at Westboro." "This is a big thing; you have no idea of its size. It will take a number of cars to remove it to Virginia, and more than a month to pack the machinery." "The first intimation I had that the company was in debt was the latter part of June, 1891. I learned from the secretary and treasurer that it was in debt to the extent of $6,000 when Leicester first visited Front Royal; that not more than $10,000 altogether had ever been put into the business of the piano company; that part of this—some $3,000 or $4,000—had been expended in the purchase of machinery." "I also found, if it had not been for the sum of $6,000 or $7,000 sent by Leicester to Trowbridge, the company could not have held its own." "Also learned in court and saw the papers where an attachment had been placed upon all the property of the Leicester Piano Company, and the whole thing was tied up and the subject of litigation." This is admitted by the witness for the plaintiff, and that the attachment was not released until August, 1891, after the institution of this suit. Mr. Cook says Leicester stated to him "that the piano company had never lost a dollar," and declared most positively "that it did not owe a dollar, and had a paid-up capital of $30,000; that the company was on the high road to prosperity," etc. Mr. Macatee says Mr. Leicester stated to "our directory that he had a piano factory at Westboro, Mass., organized with an authorized capital of $150,000, of which $30,000 had been paid in in cash; that they were doing a large and lucrative business; that they had never lost a dollar in the prosecution of their business. He said that the company did not owe a dollar in the world." W. P. King says: "Mr. Leicester represented the Leicester piano factory as with an authorized capital of $150,000 cash, paid-in capital of $30,000; that it did not owe a dollar in the world; and that it was a money-making institution, and had never lost a dollar." All of these witnesses were officers of the defendant company; all testify that these representations were the inducement to enter into the contract of September 18, 1890, and that, if they had known these representations were not true, their company would not have entered into the contract.

Now, as to the truthfulness of these representations. A careful and thorough examination of all the testimony leads the court to the conclusion that not more than $10,000 was ever paid into the business of the Leicester Piano Company. The reports from the company's books, purporting to be a statement of its assets, are so confused and unintelligible as to be entirely unreliable. The deposition of Geo. V. Leicester, the plaintiff's only witness, is so obscure, contradictory, and unsatisfactory as to furnish the court no reliable evidence as to amount of capital paid into the company. On page 62 of his deposition he says there was no paid-up capital stock. On page 95 he gives the value of the plant at $30,000, including franchises, personal property, and material manufactured. That includes all the plans and drawings and specifications and patents and machinery and stock on hand, manufactured and unmanufactured. The amount of cash capital paid in is a fact peculiarly within the knowledge of the plaintiff company. If $30,000 had been

paid in, it could easily have shown it. Its failure to do so when the fact is put in issue, as it has been in this case, compels the court to conclude that it never was paid in, and that, instead of having a working capital of $30,000, as the defendant was induced to believe, doing a flourishing money-making business, never having lost a dollar, and not owing a dollar, it really had no working capital, was doing but a feeble business, which it shut down in October, 1890, and was $6,000 or $7,000 in debt. That this piano company had never done a flourishing business is shown, we think, by the fact that from its organization, in 1880, up to the time of making the contract, September 18, 1890, it had made only eight or nine pianos, only three or four of which it had sold.

But the plaintiff claims that the defendant is estopped from alleging that it was deceived as to the character of the factory, the extent of its business, etc., because it sent its agent, Henry Cook, to examine and investigate the plant. Mr. Cook and Mr. Downing both testify that he was not sent there for that purpose; that his single object in going to Westboro, Mass., was to induce Mr. Leicester to come to Front Royal to confer with his company about removing the piano plant. Mr. Cook says he was not in the factory more than thirty or forty minutes; that he merely casually looked through several rooms, and made no effort to investigate the machinery of the company or its financial condition. Clearly, this case cannot be brought within the decision in Slaughter v. Gerson, 13 Wall. 379, Farrar v. Churchill, 135 U. S. 609, 10 Sup. Ct. Rep. 771, and Farnsworth v. Duffner, 142 U. S. 43, 12 Sup. Ct. Rep. 164, which are cited by counsel for the plaintiff. This defense cannot avail the plaintiff. The plaintiff, as to the $6,000 of indebtedness shown to have existed at the time of the contract, claims it was unknown to its agent, Leicester, and therefore he could not misrepresent the financial condition of his company when he said it was out of debt. If this were true, which the court thinks is not the case, the company, the principal in the contract, knew it, and is bound by the representations of its agent.

There is but one other point in this case to which the court thinks it necessary to give its attention. In their supplementary argument, counsel for the plaintiff claimed that the stock to be transferred by the Leicester Piano Company to the Front Royal and Riverton Improvement Company is not the stock of the Leicester Piano Company, but the individual stock of Geo. V. Leicester, and that Leicester, as an individual, is to have, out of what is to be paid by the defendant, $20,000 in money, while the Leicester Piano Company is to have the land with a building upon it of the value of $15,000. The contract will not bear the construction here attempted to be put upon it, and the case presented by the plaintiff in its bill admits of no such view. If this position be correct, the plaintiff has no standing in court, certainly so far as the sum of $14,000 is concerned. It cannot be decreed to Leicester, for he is not a party to the suit claiming it. To sustain this position would be to require the defendant company to pay $20,000 to an individual which by its contract it supposed was to be paid to the Leicester Piano Company, and to constitute with the paid-in capital of said company its working capital in the new enterprise at Front Royal; and further to require it to deed to the plaintiff, the Leicester Piano Company, property which has cost it over $17,000, and leave the defendant empty-handed, except as to the 1,750 shares of individual stock to be transferred to it by Geo. V. Leicester.

A simple statement of the case is the strongest argument against the injustice of such a decree. The principles upon which a court of equity will decree the specific performance of a contract may be briefly stated: "Upon the principle that it is in the discretion of courts of equity whether they will decree specific performance, or leave the plaintiff to his remedy at law, unless he comes with perfect propriety of conduct, clear from all circumvention and deceit, and the agreement be certain, fair, and just in all its parts, specific performance will not be decreed." 2 White & T. Lead. Cas. Eq. pt. 1, p. 524. "And not only where there has been actual misrepresentation, but also where there has been a suppression of the truth, specific performance will not be decreed." Id. 525. "There are few cases in which equity will insist on the maxim that he who seeks equity must do it, with more rigor than in suits for specific performance." Id. 550. It should be clear that he who seeks specific

performance is in a condition to perform his own part of his contract, and that he has shown himself ready, desirous, prompt, and eager to perform the contract. 2 Story, Eq. Jur. § 750. "An agreement to be entitled to be carried into specific performance, ought to be certainly fair and just in all its parts. Complainant must show that his conduct has been clean, honorable, and fair. It is a principle in equity that the court must see its way clear before it will decree specific performance, and that it must be satisfied as to the integrity and good faith of the party asking its interference." Stearns v. Beckham, 31 Grat. 388.

Applying these principles to the facts established in this case, the court cannot see its way clearly to decree a specific performance of the contract entered into on the 18th day of September, 1890. The plaintiff clearly misrepresented the character and extent of its business, its solvency and freedom from debt, and the amount of its paid-in capital. These misrepresentations were the inducements to the defendant to enter into the contract sought to be enforced. A court of equity cannot aid in the enforcement of such an agreement. The bill will be dismissed, with costs to the defendant.

Willoughby & Willoughby, for appellant.
Marshall McCormick and S. S. Turner, for appellee.

Before GOFF, Circuit Judge, and HUGHES and DICK, District Judges.

DICK, District Judge. As the appellant was plaintiff in the court below, we will, in the course of our opinion, refer to the parties as plaintiff and defendant. This case was heard in the court below upon the pleadings and proofs; and the rights of the parties were considered and determined as they existed at the time of filing the bill of complaint, and without much reference to the changed circumstances and condition of things that subsequently occurred.

This court has plenary jurisdiction, on an appeal in equity, to review a case upon its merits as disclosed by the pleadings and the proofs, and decide every question of law and of fact presented by the record and insisted upon in the court below. But an appellate court sits, not to do original justice between the parties, but to determine whether the court below committed manifest and injurious error in its decree. The decree is presumed to be according to the law and truth of the case until the contrary is made clearly to appear.

As specific performance is not a matter of absolute right in either party, an appellate court has not only the power to decide all questions of law and fact presented by the record, but also whether the court below acted wisely and justly, under the particular circumstances of the case, in exercising the extraordinary and discretionary jurisdiction of granting or refusing the specific performance of a contract. In such cases the judge in the court below is invested with the discretion of deciding a controversy according to the principles of equity, dependent on the facts and circumstances of a particular case. In so doing he exercises an extraordinary power of a court of equity, and the decree is presumed to determine correctly the substantial merits, and to adopt the best means of securing the ends of justice. Such decree may be reviewed and reversed by an appellate court if it clearly appears from the record that the judge acted unwisely or unjustly in disregard of some well-

established principle of law or equity. A different rule is applied to cases where a judge in the court below exercises the ordinary discretion of deciding incidental questions that arise in the usual course and practice of the court. In Gwynn v. Lethbridge, 14 Ves. 585, a case heard on appeal from a decree for specific performance, the lord chancellor said:

"The court must give a certain degree of credit to the decree, supposing it to be right, unless a strong ground is shown for the contrary conclusion, more than the mere dissatisfaction of the party appealing."

The general rule, with some exceptions, is well settled by numerous decisions, that objections will not be considered by an appellate court in reviewing a case unless they were presented and insisted on in the court below, as shown by the record. This question was somewhat discussed in the argument in this court, but the rules of practice and the principles involved are so well settled and familiar as not to need citation of adjudged cases.

The relief sought by the plaintiff is a decree for the specific performance of the contract set forth as an exhibit to the bill of complaint. The due execution of such contract is admitted in the answer. We will first consider the relations of the parties, and the nature, objects, and purposes of the contract at the time of its execution, and determine whether it is, on its face, such a contract as could have been, and, in view of the proofs, ought to have been, performed at the time when the defendant took steps to rescind the contract, and the plaintiff filed its bill to enforce specific performance. The contract, on its face, appears to contain the requisites to bring it within the well-established and long-recognized principles which govern courts of equity in exercising the jurisdiction of specific performance. The contract relates to the sale and conveyance of land, it is binding at law, and it is founded upon a valuable consideration, which the parties deemed adequate. Contracts for the sale and conveyance of real property are considered as proper subjects for specific performance, as courts of equity generally regard the legal remedy, by way of damages for a breach, as inadequate.

As a general rule a court of equity will not undertake to enforce, specifically, contracts for building houses or other structures which may require its supervision for any length of time; but when the work to be done is sufficiently definite, and the plaintiff has an interest in its being performed which is not capable of adequate compensation by action at law, and no long continuous supervision of the court will be required, specific performance will be decreed. The contract in this case imposed mutual and reciprocal obligations upon the parties, which they at the date of execution deemed just, fair, and reasonable, within the power of each party to perform, without injustice or oppression to either party. They dealt together in mutual confidence, with anticipations of benefit to both parties. The terms of the contract are expressed in plain, simple, and intelligible language, which presents to the court no difficult question for construction. There is no uncertainty as to the subject-matter, or as to

the obligations respectively assumed, or as to the objects which the parties had in view, and the extent and manner of their engagements. The surrounding circumstances are made so apparent by the record that the court can readily avail itself of the same light which the parties possessed when the contract was made. We would have no doubt as to the intention of the contracting parties, and would have no difficulty in determining their mutual and respective rights, duties, and obligations, but for the allegations made in the answer. There is no attempt on the part of the defendant to have the meaning of the written agreement varied or modified by construction of its terms.

The grounds of defense set up in the answer are that the contract was induced by false and fraudulent representations and improper concealments made by George V. Leicester, the agent of the plaintiff, who well knew the objects and purposes of the contract, and also knew that his statements were relied upon by the defendant. These allegations constitute important ingredients in this case, and give rise to questions of fact, to be determined by the court upon the pleadings and evidence presented by the record. These allegations charge positive fraud, and the burden of proof would be upon the defendant to sustain them by strong evidence if they were material and essential to its defense. As to how far it is necessary for the defendant to sustain those allegations of positive fraud will be considered and determined in a subsequent part of this opinion.

The plaintiff is certainly bound by the representations of its agent, made within the scope of his authority, operating as an inducement to the contract, for it is seeking the specific enforcement of the contract which he negotiated. The evidence tends strongly to show that Leicester was not only the agent, but was, for all practical purposes, the company itself. The plaintiff cannot properly insist that the evidence proves that the defendant sent Judge Cook to Westboro to examine the machinery of the factory, the extent of the plant, and the financial condition of the plaintiff, and thereby had opportunity and convenient means of correct information, and relied upon its own knowledge and judgment in executing the contract. Judge Cook was only the soliciting agent of defendant, and went to Westboro before the date of the contract to solicit Leicester to come to Front Royal for the purpose of negotiating the contract. He was not a scientific or practical machinist. He did not make, or attempt to make, a careful examination of the plant, and he was not furnished with convenient means of inquiry and investigation as to the financial condition of plaintiff, and only spoke to the defendant in general terms of the handsome machinery. He doubtless regarded the kind attention of Mr. Leicester as acts of courtesy to a stranger, and, should Mr. Leicester put any other construction upon his acts of intercourse, his conduct would tend strongly to show that he at that time contemplated deception and fraud. Mr. Leicester was in a position to have accurate knowledge upon the subjects which he represented, and the defendant had a right to rely,

and the evidence shows it did rely, upon his statements, properly presuming that he could and would give the expected and essential information fully and correctly.

The mere fact that Leicester, in erecting the factory buildings, acted with "bad judgment and management," and with "reckless and wasteful extravagance," and in other ways misapplied the funds with which he had been intrusted, is not available to defendant as a defense in this suit. The defendant had agreed to erect the buildings at a cost not to exceed $15,000, and Leicester was its contract agent for such purpose, and was in matters of expenditures under its supervision and control. If this mismanagement were the only defense, the court in a decree for specific performance would doubtless have made provision for compensation to defendant for excess of expenditures, as Leicester was in many respects the agent also of the plaintiff.

It is unnecessary for this court to determine the question as to the legal force and effect of the action of the defendant purporting to rescind the contract on the ground of false and fraudulent representations as to matters that were material, and were an inducement to the contract. It certainly acted promptly, and gave a notice that could not be misunderstood. A rescission of the contract is not insisted upon in the answer, and such affirmative relief could not be granted in this case except upon the prayer of a cross bill.

As the counsel on both sides, in oral arguments and elaborate briefs, discussed with much learning, logical force, and earnest confidence questions of law relating to charges of false and fraudulent representations and the proofs necessary to sustain such charges, we will briefly state our views upon the subject.

When a party seeks the rescission of a contract upon the ground of actual or positive fraud he must distinctly and directly charge the fraud, and by evidence clearly sustain such definite charges; and in doing so courts will allow him large latitude in the admission of evidence, as fraud is odious to a court of justice, and vitiates everything into which it enters. With respect to what will constitute fraud, it is impossible to lay down a specific rule, as there are great diversities of fraud which arise out of the peculiar facts of each case, as to the relations, condition, and connection of parties to a transaction, and as to their respective means of information. The rules, principles, and relieving methods of equity jurisprudence are sufficiently elastic and flexible to enable chancellors, by their learning, experience, wisdom, and natural and cultivated sense of justice, to meet every emergency, and by their exercise of judicial power prevent wrongs and injuries about to occur from deceitful practices and artful devices, contrary to the rules and principles of common honesty, and also to remedy the consequences when such wrongs and injuries have been effected. Examples are given in many adjudged cases which have established some general rules and principles that will apply to most cases that arise in the course of transactions among men, in the various departments of business and inter-

course. In relation to frauds in the procurement of contracts by willful misrepresentations, Mr. Adams formulated the following comprehensive definition:

"In order to constitute a fraud of the first class there must be a representation, expressed or implied, false within the knowledge of the party making it, reasonably relied on by the other party, and constituting a material inducement to his contract or act." Adams, Eq. 176.

The author then illustrates the principles of this definition as applicable to the rescission of contracts. In the course of the discussion of the subject he says:

"But if a warranty or covenant is not given, a mere representation honestly made, and believed at the time to be true by the party making it, though not true in fact, does not amount to fraud."

This last proposition of law may be correct in cases of rescission where positive fraud—the intention to deceive—must generally be shown; but it is not correct as to implied fraud, or fraud in law, as will appear by reference to many English and American cases, some of which are cited in 1 Story, Eq. Jur. § 193 et seq. The power of a court of equity to rescind a contract at all, instead of leaving parties to an action at law for damages, is properly deemed an extraordinary power, and to justify its exercise the alleged fraud or mistake must be made very manifest. The burden of proof to show these grounds for a rescission rests on the plaintiff, and not on the defendant. A court of equity is always reluctant to rescind unless the parties can be put back in statu quo. If this cannot be done, it gives such relief only where the clearest and strongest equity imperatively demands it. Grymes v. Sanders, 93 U. S. 55; McLean v. Clapp, 141 U. S. 429, 12 Sup. Ct. Rep. 29.

There is another class of contracts referred to in numerous adjudged cases, where misrepresentations do not invalidate the agreements of parties that come within the rule of caveat emptor. This maxim is a rule of the common law applicable to contracts of purchase of both real and personal property, and is recognized and observed, both in courts of law and courts of equity, where there is no positive fraud in the transaction. Under this rule, where a purchaser of real or personal property asks a court of equity to rescind a contract, or withhold the equity of specific performance, on the ground of misrepresentations on the part of the vendor, he must establish his allegations by clear and irrefragable evidence; and if it appears that he had resorted to the proper means of verification, so as to show that he in fact relied upon his own inquiries and judgment, or if the means of investigation and verification were at hand readily accessible, and his attention was drawn to them, or reasonable suspicion might have been excited by the attendant circumstances, relief will be denied. The law never presumes positive fraud, and in such cases, when alleged, a party who seeks affirmative relief on the ground of such fraud, either by original or cross bill, must establish his specific charges by clear and strong proof.

These views of the law which we have presented are not in conflict with the cases referred to in the brief of the counsel of plaintiff, and seem to be in harmony with the many and well-selected cases

cited in the briefs of counsel of defendant. We do not cite these and other authorities, as the principles announced are fundamental, founded in reason and natural justice, they are clearly and fully discussed by text writers, and the court would find some difficulty in selecting a reasonable list of the best cases from the large array of learned and able decisions of eminent judges. These rules and principles are not strictly applicable in all cases where courts of equity exercise the discretionary jurisdiction of specific performance of contracts. The specific enforcement of the agreements of parties is a matter entirely of equitable jurisdiction, and depends upon the sound discretion of the court in the due administration of equitable justice. The difference between that degree of unfairness which will induce a court of equity to interfere actively by rescinding a contract, and that which will induce a court to withhold its aid in enforcement in specie, is well settled by adjudged cases. Manufacturing Co. v. Gormully, 144 U. S. 224, 237, 12 Sup. Ct. Rep. 632. A court of equity will often refuse to enforce a contract specifically when it would refuse also to rescind it. Adams, Eq. 84; Jackson v. Ashton, 11 Pet. 229.

A plaintiff always has a remedy at law for the breach of a binding contract, and can obtain such pecuniary compensation as a jury may think he is justly entitled to. If he seeks the extraordinary relief of specific enforcement, he must come into a court of equity with clean hands, and show that the contract was the result of honest and candid dealings on his part, and that the contract is certain, fair, and just in all its terms. It must be such a contract as would not be obnoxious to the sense of natural justice and sound morality, under the circumstances of the parties. If a plaintiff possesses peculiar and superior knowledge on the subject-matter of the contract, and knows, or has good reason to believe, that he is relied on by the other party for full and correct information, he must impart such information, or refer the inquirer to ready and accessible sources of information, and do nothing to retard or mislead investigation.

The principles involved in the rule of *caveat emptor* are not applicable to this case. The maxim in its terms applies only to purchasers who are dealing with vendors on equal footing, where neither party is presumed to trust each other, and where the means of knowledge are at hand, equally available to both parties, and the subject-matter of sale and purchase is alike open to their inspection, or where they rely and act upon their own judgment. In this case the defendant was a vendor, and not a purchaser, and received no pecuniary compensation, but freely and readily advanced its money to promote and secure the speedy performance of the contract. It had no immediate interest in the plant of the plaintiff company that was to be located near Front Royal, except as a stockholder, and the anticipated advantages to be derived from the building up of the contemplated city.

The nature of representations and the presumptions that arise therefrom are often dependent upon the condition, relations, and circumstances of the contracting parties. It is in this sense that the remark of Lord Hardwicke is to be understood when he said: "Fraud

may be presumed from the circumstances and condition of the parties contracting; and this goes further than the rule of law, which is that fraud must be proved, not presumed." 1 Story, Eq. Jur. § 190. When the circumstances are such that the parties may rely upon the representations of each other, the courts in England and this country seem to hold a party liable for representations not known, by him to be true, as well as for those which he actually knows to be false. 1 Story, Eq. Jur. § 193. In many kinds of business transactions the law does not require a prudent man to deal with every one as a sharper or a rascal, and make full and accurate precedent investigations, or require express warranty to guard against the falsehood of every representation which may be made as to matters that constitute material inducements to a contract. There must be a reasonable reliance upon the truth and integrity of men, or the transactions of business, trade, and commerce would not be conducted with the facility, confidence, and advantage which are essential to successful enterprise, and the advancement of individual and national wealth and prosperity. The rules and principles of law and equity are founded on natural justice and cultivated reason, and are shaped and applied by the wisdom of human experience.

The principles and methods relating to the doctrines of specific enforcement of contracts originated in early times in the English court of chancery, and were designed to afford complete relief when the remedy at the common law by way of damages was inadequate; the purpose of the court being to do equal and full justice in the exact accomplishment of the intention and objects of the parties, as disclosed by the well-understood terms of their agreement. These rules and principles of equity jurisprudence have been developed, defined, and established by a long line of precedents which are recognized and regarded as authorities. As these numerous decisions have been made upon the facts and circumstances of each case, some seeming diversities and conflicts have arisen which cannot be reconciled without a careful consideration of the shades of difference which were caused by the peculiar facts and circumstances involved. All decisions concur in the general rule that a court of equity will not exercise this extraordinary jurisdiction, dependent on judicial discretion, unless the plaintiff has dealt fairly in good faith, and with moral honesty, where he is so expected to act by the other party, and the contract is such as from its express terms can be clearly understood, and when the defendant can, without grievous hardship, and ought in common honesty to, perform his engagements.

A plaintiff may have acted in good faith, and still not be entitled to specific enforcement of a contract, if the defendant placed an erroneous construction upon the propositions of negotiation, and by doing so committed an honest mistake, which a fair and reasonable man, under the circumstances, might have made without inexcusable ignorance or negligence. When the terms of a contract are reduced to writing, and are expressed in plain, simple, and intelligible language, that in its ordinary meaning admits of but one fair and reasonable construction, a party cannot be heard to complain if he

placed a contrary construction upon the language employed to express the intention and purposes of the parties, if there has been no fraud, accident, or excusable mistake arising from the conduct of the other party. Seitz v. Machine Co., 141 U. S. 510–517, 12 Sup. Ct. Rep. 46.

In entering into the contract now before the court, we are of opinion, in view of all the surrounding circumstances, that the defendant could reasonably rely upon the representations made by the president and general manager of the plaintiff company, and was not required by any principle of law or equity, or by ordinary prudence in business transactions, to resort to any other source of information. He was the chief promoter and organizer of the plaintiff company in Detroit in 1880. After the company had remained dormant for nearly 10 years he was its reorganizer, in 1890, and reported to the stockholders a balance sheet of its financial condition. He had the management of the business at Westboro, and owned nearly all the stock of the company. That which he ought, by proper diligence, to have known as to the financial condition and general course of business of the plaintiff company, he might well be presumed to have known when he was conducting the negotiations which were consummated in the contract now before the court. Martin v. Webb, 110 U. S. 7–15, 3 Sup. Ct. Rep. 428.

The defendant in its answer alleges that the representations of Leicester were relied on, were material inducements to the contract, and they were false and fraudulent. When a defendant in a case like this makes allegations of fraud in his answer as a defense, he is not required to prove the fraud as conclusively as a party who seeks affirmative relief on such grounds. The burden of proof in such a case is upon the plaintiff to show that the contract which he seeks to have enforced specifically is reasonable, fair, equitable, and free from any taint of fraud. If the evidence on the part of the defendant shows suspicious facts and circumstances sufficient to cast a taint of fraud on the transaction, and creates in the mind of the court a reasonable doubt as to the fairness and justice of the contract, or the honesty and truth of the negotiations that led to its execution, the court can properly refuse the extraordinary relief prayed for, and leave the plaintiff to the ordinary legal remedy for compensation in damages. Hennessey v. Woolworth, 128 U. S. 438, 9 Sup. Ct. Rep. 109.

After carefully reading and considering the record, we concur with the judge in the court below as to his findings of fact and his conclusions of law. The presumption of the correctness of a decree in a court of original jurisdiction is especially strong and influential in a case when all the evidence is in writing and remains unchanged, and the arguments of counsel are substantially the same, and the judge, after a full and patient hearing, exercises the discretionary jurisdiction of granting or refusing the specific enforcement of a contract. There can be no doubt that untrue representations were made by Mr. Leicester as to the indebtedness and financial condition of the plaintiff company at the time of the negotiation and execution of the contract now before us. As it is unnecessary

in this case to determine the question whether such misrepresentations amounted to actual or constructive fraud, or were honestly believed when made, and were ignorantly and innocently untrue, we leave this matter just as it was determined in the court below.

For the purpose of showing additional reasons sustaining the decree in the court below, we deem it proper to refer to two other questions which are usually involved in cases of this character. They appear in the record, were presented in the oral arguments and briefs of counsel, and were partly considered by the judge at the original hearing.

First. Would a decree for specific performance have operated oppressively and unjustly as to defendant under the changed circumstances and condition of affairs existing at the time of the hearing in the court below?

Secondly. Was the mutual enforcement of the contract in specie practicable,—could its fulfillment by both parties have been judicially secured?

The defendant company was organized for the purpose and had for its object the building of a town between Front Royal and Riverton, in Virginia. Like numerous other land companies and thousands of men, its stockholders were animated by the spirit of speculative adventure and enterprise that pervaded many states, misled the judgments of some of the most honest and best business men in the country, and resulted in much financial embarrassment and disaster. We have the charity to suppose that the stockholders of defendant company honestly expected, in the near future, to see a large and thriving town, filled with an energetic and busy people engaged in the prosperous pursuits of active trade and mechanical industry and enterprise. The president of the plaintiff company seems, from the evidence, to have been infected with the same contagious and speculative spirit, and we may judge of the brightness and vastness of his hopes by the name of the company which he organized and called "Samarcand," the name of an imperial city which, in a former century, was enriched and adorned with immense wealth and oriental magnificence.

The real essence of this contract was the establishment of a large and successful piano factory near Front Royal, not solely for the benefit of the plaintiff, but also for the anticipated benefit of the defendant. It showed its integrity of purpose and sincerity of faith by its prompt expenditure of $23,000 in the piano factory enterprise. The plaintiff well knew the objects and purposes of the defendant, and concurred in the enthusiasm and anticipations of the "boom." The only damages that were sustained by the plaintiff was the stopping of its operations at Westboro, and the extent of this injury can be readily ascertained and assessed by a jury as damages, and adequate compensation can be obtained by process of execution against the solvent defendant. If the plant was prosperous and lost no money at Westboro, it could, by resuming its operations, have again prospered, and gratified its neighbors who had indulged regrets at the prospect of removal.

Now, under the changed conditions and circumstances produced

by the unexpected collapse, it certainly would not be just and equitable to allow the plaintiff to escape all material losses, and enable the president of the company to seize upon, as a tabula in naufragio, the balance of the money mentioned in the contract. At the time of the execution of the contract the piano factory scheme was, in the estimation of the parties, a plausible and hopeful adventure and enterprise, but now the removal of the piano factory plant to Front Royal would certainly be an injudicious and hazardous experiment, which reasonable and prudent men would not undertake. A considerable part of the remaining assets of the now solvent defendant would be wasted by being applied to the doubtful venture, or would be claimed and appropriated by Mr. Leicester as the purchase money of his individual stock. We may reasonably suppose that such a disposition of the money would greatly embarrass the defendant in its future enterprises, and would not secure the success of the piano factory scheme, the primary object of the contract. A court of equity will not usually rescind a contract on the ground that subsequent events have rendered it burdensome on one of the parties; but the rule is, in some respects, different in cases of specific performance, where the court exercises a wise and sound discretion for the purpose of subserving the ends of justice, in view of all the circumstances of the particular case. This discretion of withholding its aid is exercised even when the contract is fair in its terms, if its enforcement, from subsequent events, or even from collateral circumstances, would work hardship or injustice to either of the parties. Willard v. Tayloe, 8 Wall. 557-566; 2 Story, Eq. Jur. §§ 750-769.

We will now consider the question whether the fulfillment of the contract could have been judicially secured by a decree in the court below. A decree, in such a case as this, that did not secure the mutual performance of the contract, would have been manifestly unjust and inequitable. The mutual enforcement of contracts is one of the imperative duties of a court of equity in exercising this extraordinary jurisdiction. From the facts disclosed in the record we are of opinion that the removal of the piano factory plant from Westboro to Front Royal could not have been secured by a just decree. The plaintiff alleges in its bill of complaint that it is ready, willing, and able to perform all its obligations, "except so far as it is prevented by the said acts of the defendant." The defendant did furnish $6,000 for the purpose of removing the plant, and this amount was sufficient, but was applied by Leicester to other purposes than those contemplated in the contract. The plaintiff does not allege and prove its independent ability to furnish means for the removal of the plant. The evidence shows that at the date of the contract, and for some time thereafter, the works were operated by means of borrowed money, for which it had incurred indebtedness that was only in part relieved by the $6,000 advanced by the defendant, as in April, and for several months thereafter, the plant was in custody of the law by virtue of process of attachment to secure other debts. The defendant had expended more than $17,000 in the erection of the buildings, and had advanced

$6,000 for the purpose of removing the plant, and was under no contract obligation to render further financial assistance to the plaintiff to accomplish such removal, as the contract in express terms provides "that no payment in excess of $6,000 shall be called for or made until said plant shall have been removed from its present location to the buildings to be erected as hereinbefore mentioned." The defendant had expended more money than it agreed in the contract to expend.

If a party has done all that could reasonably be expected of him to perform as to his part of an agreement, he certainly cannot be considered, in a court of equity, as having failed to meet his obligations, and as having afforded the other party a just excuse for nonperformance. This proposition of law is certainly correct as to the present case, where the plaintiff has not shown its independent ability and ready means to perform its obligations, and is seeking a specific performance of the contract.

Had the court below by decree ordered the defendant to pay all, or any part, of the balance of money mentioned in the contract before the removal of the plant by the plaintiff, such decree would have violated, instead of have justly enforced, the plain terms of the contract of the parties.

It appears from the evidence that the sum of four or five thousand dollars would be required to remove the plant as contemplated by the parties, and the plaintiff has not shown that it possessed the available means to meet this obligation, to be performed before it would be entitled to further pecuniary assistance from the defendant. Independent of the question of fact as to false and fraudulent representations which were principally considered in the court below, it seems to us that the plaintiff's prayer for the relief of specific performance could have been properly denied upon the grounds that specific enforcement of the contract would have been unjust and oppressive to the defendant, and also that the fulfillment of the contract on the part of the plaintiff could not have been secured by decree.

As to the last contention mentioned in the opinion of the judge in the court below, we deem it only necessary to use his appropriate language: "A simple statement of the case is the strongest argument against the injustice of such a decree."

The decree of the court below is affirmed, with costs.